**STEEL PARTNERS II, L.P., Plaintiff–Counter–Defendant–Appellant,**

v.

**BELL INDUSTRIES, INC., Defendant–Counter–Claimant–Appellee.**

**Docket No. 00–9341.**

United States Court of Appeals, Second Circuit.

Argued: May 22, 2001.

Decided: Dec. 30, 2002.

Thomas J. Fleming, Olshan, Grundman, Frome, Rosenzweig & Wolosky LLP, New York, N.Y. (Kenneth J. Rubinstein and Kristi A. Doyle, of counsel), for Plaintiff–Counter–Defendant–Appellant.

Neal H. Klausner, Davis & Gilbert LLP, New York, N.Y. (Christopher G. Ferro, Davis & Gilbert LLP, New York, NY, and David A. Schwarz and Eric B. Carlson, Irell & Manella LLP, Los Angeles, CA, on the brief), for Defendant–Counter–Claimant–Appellee.

Before WALKER, Chief Judge, JACOBS, Circuit Judge, and LARIMER, Chief District Judge.*

JOHN M. WALKER, JR., Chief Judge.

Plaintiff-counter-defendant-appellant Steel Partners II, L.P. ("Steel Partners") appeals from the September 27, 2000, judgment of the United States District Court for the Southern District of New York (Naomi Reice Buchwald, *District Judge*) granting summary judgment in favor of defendant-counter-claimant-appellee Bell Industries, Inc. ("Bell") and declaring that a $1.30 dividend paid on 200,000 Bell shares owned by Steel Partners for less than six months fell within the definition of "profit" as used in Section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b), and thus was required to be disgorged to Bell. We hold that under the circumstances of this case, the dividend was not subject to disgorgement.

---

* The Hon. David G. Larimer, Chief Judge of the District Court for the Western District of New York, sitting by designation.

Accordingly we reverse the district court and remand for entry of summary judgment in favor of Steel Partners.

## BACKGROUND

Bell stock is publicly traded on the New York Stock Exchange. Steel Partners, an investment fund, began acquiring Bell stock in October 1998. That same month, Bell entered into an agreement (subject to shareholder approval) for the cash sale of a large division, its Electronics Distribution Group ("the Division").

On December 23, 1998, Bell issued a proxy statement to its shareholders seeking approval of the sale. On December 31, 1998, Steel Partners' holdings in Bell reached ten percent, making it a statutory insider of Bell under Section 16(b). Steel Partners remained a statutory insider during the rest of the period relevant to this suit. Bell shareholders approved the sale of the Division in January 1999 and the sale closed with Bell receiving approximately $177 million in cash.

In February 1999, the company issued a press release announcing its intention to use the proceeds of the sale to make a cash distribution of approximately $7.00 per share to its shareholders within ninety days—its first cash dividend in six years. In May 1999; Bell declared "an initial cash distribution" of $5.70, payable in June 1999, representing "the first portion of the previously announced planned distribution," and publicly announced its "plans to distribute additional cash of approximately $1.30 per share following the sale of remaining real estate properties associated with the [Division]."

Steel Partners made a final purchase of Bell stock—the 200,000 shares at issue in this suit—on October 7, 1999, and paid $5.30 per share. On October 8, 1999, Bell issued a press release stating that its Board of Directors had rejected an offer from Steel Partners to purchase Bell Industries for $5.30 per share, but that it would consider a higher offer.

On October 20, 1999, Bell publicly announced its intention to make the second cash distribution of the Division proceeds "during the fourth quarter" of 1999. On December 3, 1999, as previously forecasted, Bell declared the distribution of $1.30 per share, payable on December 17, 1999, to shareholders of record on December 10, 1999. The dividend was distributed as announced on December 17 (the "December Dividend"). The next business day, Steel Partners sold 547,200 shares at an average price of $6.37 per share. It is undisputed that for purposes of Section 16(b), this sale necessarily included the 200,000 shares Steel Partners had purchased on October 7.

On January 21, 2000, in order to effectuate compliance with Section 16(b), Steel Partners paid Bell $214,960, the difference between the $6.37 sale price of the 200,000 shares and the $5.30 price for which they were purchased two months earlier. After receiving the $214,960 payment, Bell claimed that Steel Partners' "profit" under Section 16(b) also included the December Dividend, i.e., an additional $1.30 per share or $260,000.

Steel Partners commenced this action on January 24, 2000, seeking a declaration that it had disgorged all profits owed under Section 16(b). Bell counterclaimed for a declaration that the December Dividend represented part of Steel Partners' "profit" under Section 16(b). The parties thereafter cross-moved for summary judgment and submitted Joint Stipulated Facts.

For purposes of the summary judgment motion, Bell does not dispute that at all relevant times Steel Partners: (1) had no representative on Bell's Board of Directors; (2) was not consulted before Bell's

decision to declare cash distributions; and (3) learned of Bell's intention to distribute dividends, including the December Dividend, at the same time as the public and all other Bell shareholders.

In granting summary judgment in favor of Bell, the district court reviewed prior case law that held that dividends are not generally included in the calculation of Section 16(b) profits if they are paid out in the ordinary course of business, *see, e.g., Blau v. Lamb*, 363 F.2d 507, 528 (2d Cir. 1966); *Adler v. Klawans*, 267 F.2d 840, 848–49 (2d Cir.1959), and concluded that because the December Dividend represented the balance of a cash distribution of the proceeds from the sale of 49% of Bell's assets, it was not a dividend paid out in the ordinary course of business and therefore had to be disgorged. *See Steel Partners II, L.P. v. Bell Indus., Inc.*, No. 00 Civ. 0499, 2000 WL 1372831, at *3 (S.D.N.Y. Sept. 21, 2000).

## DISCUSSION

We review a grant of summary judgment *de novo*. *See Beckford v. Portuondo*, 234 F.3d 128, 130 (2d Cir.2000). Summary judgment is appropriate only where, "[e]xamining the evidence in the light most favorable to the nonmoving party," *Adjustrite Sys., Inc. v. Gab Bus. Servs., Inc.*, 145 F.3d 543, 547 (2d Cir. 1998), the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed.R.Civ.P. 56(c).

Section 16(b) of the Securities and Exchange Act of 1934 provides in relevant part:

> For the purpose of preventing the unfair use of information which may have been obtained by [an insider, including the beneficial owner of 10% or more of the issuer's stock,] by reason of his relationship to the issuer, *any profit* realized by him from *any purchase and sale* . . . of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of [the insider] in entering into such transaction or holding the security . . . purchased. . . .

15 U.S.C. § 78p(b) (emphasis added).

The purpose of Section 16(b) is to deter "insiders," who are presumed to possess material non-public information about the issuer, from using such information to purchase or sell the issuer's equity securities at an advantage over persons with whom they trade. *See Gwozdzinsky v. Zell/Chilmark Fund*, 156 F.3d 305, 308, 310 (2d Cir.1998). The statute imposes "strict liability for all transactions that meet its mechanical requirements," *id.*, and, by its plain language, requires that "any profit" derived from the matching of any purchase and any sale of a corporation's securities occurring within six months of each other must be disgorged, irrespective of the insider's actual knowledge or intent or whether overall trading during that six months (*i.e.*, all sales and purchases combined) resulted in a loss. The issuing corporation or, derivatively, a shareholder is entitled to maintain an action seeking to have the profit disgorged to the corporation. *See* 15 U.S.C. § 78p(b); *see also Tristar Corp. v. Freitas*, 84 F.3d 550, 552 (2d Cir.1996).

At issue in this case is whether the December Dividend paid on the 200,000 shares purchased by Steel Partners on October 7, 1999 and sold on December 20, 1999 (three days after the December Dividend was paid), constituted a "profit realized by [Steel Partners] from [the] purchase and sale." Unfortunately, that determination cannot be made by resort

to the plain language of the statute: Dividends, which are neither contingent upon nor influenced by the occurrence or timing of a subsequent sale of the shares, do not inevitably constitute "profit" from a purchase and sale, and can just as readily be categorized as an incident of ownership. *Cf. Champion Home Builders Co. v. Jeffress*, 385 F.Supp. 245, 250 (E.D.Mich.1974) (holding that dividends constituted distribution of earnings, not profit from purchase and sale). Several of the terms used in Section 16(b) are defined in the statute and regulations. *See, e.g.*, 15 U.S.C. § 78c(13) (defining "purchase"); 15 U.S.C. § 78c(14) (defining "sale"); 17 C.F.R. § 240.16a–1 (defining most of the terms used in Section 16); 17 C.F.R. § 240.16a–2 (defining persons and transactions subject to Section 16); 17 C.F.R. § 240.16b–6 (defining types of derivative securities and transactions subject to Section 16). The term "profit" is not defined, however.

■ Where, as here, the transaction at issue does not plainly fall within the literal terms of the statute, "[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with the legislative purpose." *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 263 (2d Cir.1969); *see Gwozdzinsky*, 156 F.3d at 308, 310 (noting that courts look to policy "to avoid the harsh results of this inflexible rule"). The usual problems associated with discerning the purpose of a legislative enactment from uncertain legislative history are obviated here because "[t]he objectives sought to be accomplished in adopting Section 16(b) are clear from the language of the statute without reference to the legislative history." *Adler*, 267 F.2d at 844. Congress stated its purpose in the statute itself: to " 'prevent[ ] the unfair use of information which may have been obtained

by [a statutory insider] by reason of his relationship to the issuer.' " *Id.* (quoting Section 16(b)). Thus, whether or not a "borderline transaction" falls within the parameters of Section 16(b) ultimately turns on "whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 594, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *see also Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 424, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) ("[W]here alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders."); *Blau*, 363 F.2d at 519 (noting statutory policy of "preventing the unfair use of inside information by corporate insiders").

In *Kern County*, the Court, recognizing the overbreadth of Section 16(b), observed that "under the[ ] strict terms [of Section 16(b)], the prevailing view is to apply the statute only when its application would serve its goals." 411 U.S. at 595, 93 S.Ct. 1736. Thus, courts are authorized to

> look[ ] into the substance of borderline transactions alleged to have violated Section 16(b) to determine whether in fact [they] contravened the underlying rationale of [Section 16(b)] (*i.e.*, presented the potential for speculative abuse of inside information), and, where the possibility of speculative abuse was not shown, to refuse to impose liability.

*Gwozdzinsky*, 156 F.3d at 310; *see, e.g., Kern County*, 411 U.S. at 596, 93 S.Ct. 1736 (profit made by ten percent beneficial owner on option did not fall within Section 16(b) because facts failed to support inference that owner had or was likely to have access to inside information); *Blau*, 363

F.2d at 522–23 & n. 22, 528 (stock conversion and payment of dividends did not fall within Section 16(b) because they did not involve possibility of speculative abuse). The Second Circuit has applied this principle to the questions of whether a "purchase and sale" has in fact occurred, *see Gwozdzinsky*, 156 F.3d at 310, and whether someone qualifies as an insider, *see C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 566 (2d Cir.1989) ("The general approach established by our Court ... is consistent with that of the Supreme Court in § 16(b) cases in which the [Supreme] Court has emphasized that potential access to inside information is the key to finding liability, rather than rigid application of statutory designations.") (citing *Kern County*, 411 U.S. at 597–604, 93 S.Ct. 1736 and *Foremost–McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251–54, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976)).

With respect to dividends, we have observed that they should be subject to disgorgement in connection with a concomitant "purchase and sale" when they are the result of manipulation by the Section 16(b) insider (*e.g.*, when the insider engineers the declaration of the dividend and then purchases shares before the dividend is publicly announced). *See Blau*, 363 F.2d at 522 n. 22. The absence of manipulation or access to insider information, however, has led us to exclude dividends from recapture in certain circumstances. *See id.* at 528; *Adler*, 267 F.2d at 849. In *Blau* we held that dividends paid out in the ordinary course of business should not be subject to disgorgement. *See Blau*, 363 F.2d at 528. In *Adler*, we discussed three other factual permutations that would preclude the imposition of liability: (1) where the trader first purchased shares long after the dividend had been declared and before the trader became an insider; (2) where the trader, although owning a substantial amount of stock, was not an insid-

er at the time the dividend was declared; and (3) where the trader received the dividend only with respect to shares subsequently sold for a loss that was greater than the dividend. *See id.* at 848–49. We held that none of these circumstances justified disgorgement because the statutory presumption—that an insider is in a position that could be used to influence the sale price—was inapplicable. *See id.* at 848 ("Our primary holding simply gives effect to the statutory mandate that, at some moment before making a sale of stock, the insider was in an official position which he could have used to influence the sale price.").

None of the specific circumstances identified in *Blau* and *Adler* as precluding Section 16(b) liability are present here. As noted by the district court, the December Dividend was not ordinary. *See Steel Partners*, 2000 WL 1372831, at *3. Bell had paid no cash dividends between 1993 and 1999. *Cf. Blau*, 363 F.2d at 528 (finding dividend to be "regular, quarterly" payout to shareholders based on company's dividend payment history). Indeed, Bell's decision to pay a dividend in 1999 was prompted chiefly by an extraordinary transaction: the sale of the Division.

In arguing against disgorgement, Steel Partners points out that it was not a statutory insider at the time Bell's board approved the asset sale that led to the extraordinary dividend. This fact is not dispositive, however, because Steel Partners was a statutory insider by the time Bell's shareholders approved the sale of the Division and the sale was consummated. Additionally, the December Dividend was not formally declared until after Steel Partners purchased the 200,000 shares at issue, and only then was the record date fixed. These events, under circumstances not present here, could have provided an opportunity for abuse

and thus would ordinarily weigh in favor of finding that the December Dividend constituted Section 16(b) profit subject to disgorgement.

The facts of this case, however, lead us to the opposite conclusion, namely that because there was no possibility of speculative abuse of inside information, the December Dividend should not be subjected to Section 16(b) disgorgement.

The Stipulated Facts presented to the district court demonstrated that Steel Partners had neither access to inside information nor control or influence over Bell's corporate affairs and, thus, was in no better position than other shareholders or the public to weigh the benefits of purchasing or selling the shares. To begin with, these events took place during a failed attempt by Steel Partners to take over Bell. This situation, therefore, is not unlike the one presented to the Supreme Court in *Kern County,* with respect to which the Supreme Court noted that given the hostile atmosphere, it is "unrealistic to assume or infer ... that [the takeover party] had or was likely to have access to inside information." 411 U.S. at 596, 93 S.Ct. 1736; *see also Am. Standard, Inc. v. Crane, Co.,* 510 F.2d 1043, 1053 (2d Cir.1974) ("[T]he status of a defeated tender offeror affords no presumption of abuse of confidential information by virtue of relationship to the issuer ... [and] rebuts the presumption of control.").

Other stipulated facts confirm that Steel Partners did not have access to inside information or control over the December Dividend. As Bell conceded, Steel Partners had no representative on Bell's Board of Directors; it was not consulted before

Bell's decision to declare cash distributions (including the December Dividend); and, finally, it learned of the decision to pay dividends (including the December Dividend) at the same time as the public and all other Bell shareholders. These conceded facts negate any inference that Steel Partners could have abused inside information or manipulated the December Dividend by virtue of its position as a stockholder of more than ten percent of Bell's stock. See *Kern County,* 411 U.S. at 596, 93 S.Ct. 1736.

Moreover, the December Dividend could not possibly have provided an opportunity for speculative abuse because it was a matter of public knowledge months before Steel Partners purchased the 200,000 shares in October 1999. Bell's intention to pay a $7.00 dividend was first announced in February 1999 and most of that dividend ($5.70) was declared in May and paid out in June of 1999. Steel Partners' receipt of this initial dividend payment presented no Section 16(b) issues.

Bell publicly announced its intention to pay the December Dividend in May 1999, more than four months before Steel Partners made its final 200,000 share purchase of Bell Stock. As we explained in *Adler,* there is little possibility of abuse of nonpublic information when a dividend "ha[s] been publicly announced before the purchase of stock by the insider and before he became such" because the "market price ... represents a 'bargain' [that] includes and contemplates any dividends" such that the insider is "in no different position with respect to this dividend from that of any other member of the stock buying public." [1] 267 F.2d at 848; *see also Gwozdzin-*

---

1. Although the statement in *Adler* exempting from disgorgement "dividends which have been publicly announced before the purchase of stock by the insider *and before he became such,*" *Adler,* 267 F.2d at 848 (emphasis added-

ed), can be read as requiring that the dividend be publicly announced both before the shares were purchased *and* before the defendant became an insider, we believe that with respect to traders who become statutory in-

*sky v. Magten Asset Mgmt. Corp.*, 106 F.3d 469, 471 (2d Cir.1997) (finding that when all stockholders are treated the same (*i.e.*, via *pro rata* rights and public information), "there is little fear of insiders using confidential information to benefit themselves at the expense of other shareholders"); *Roberts v. Eaton*, 212 F.2d 82, 85 (2d Cir.1954) ("[L]ike treatment of all stockholders will in most cases remove the possibility of abuse."). Thus, even if it could be argued that Steel Partners somehow calculated that if its takeover efforts failed, it could nevertheless reap the benefit of the announced December Dividend, the dividend still would not fall within the confines of Section 16(b) because Steel Partners' speculation would not have been based on inside information. *See Kern*, 411 U.S. at 597, 93 S.Ct. 1736 (noting that even if tender offeror speculated that it could profit from defensive merger, this would not have been speculative abuse based on inside information so as to fall within Section 16(b)). As we have noted, Section 16(b) cannot and does not seek to punish all possible abuses by an insider. *See Blau*, 363 F.2d at 522 n. 22 (noting limits on the harms that are redressable by Section 16(b)); *Lewis v. Varnes*, 505 F.2d 785, 787 (2d Cir.1974) (same). Rather, its aim is to deter the use of inside

information to disadvantage those with whom the insider trades. No such disadvantage could occur here.

In sum, we hold that because Steel Partners had neither access to nor an opportunity to abuse material non-public information, it is not required to disgorge the December Dividend under either a literal reading of Section 16(b) or the policies that underlie the rule. This is not to say that dividends may never be included in the calculation of Section 16(b) profits. As we noted in *Adler*, "[s]ituations may well arise relative to dividends where they are so inextricably connected with the 'purchase and sale' of stock and possible manipulation by insiders ... as to compel the formulation of a rule on the subject ... to prevent the frustration of the statutory purpose." *Adler*, 267 F.2d at 849; *see also Blau*, 363 F.2d at 522 n. 22 (noting circumstances in which dividends might be included as Section 16(b) profit). But to require disgorgement under the circumstances of this case would simply result in a windfall to Bell at the expense of a spurned suitor.

## CONCLUSION

We hold that the December Dividend paid on the 200,000 Bell shares owned by

---

siders solely by virtue of owning ten percent or more of the issuer's stock, it is only necessary that the dividend be publicly announced before the shares at issue are purchased. This is because, regardless of when a dividend is publicly announced, there can be no Section 16(b) liability if a ten percent beneficial owner was not already an insider *before* purchasing the shares at issue. *See* 15 U.S.C. § 78p(b) (this section does not cover "any transaction where [a] beneficial owner was not such both at the time of the purchase and the sale"); *Foremost–McKesson*, 423 U.S. at 239, 249–50, 96 S.Ct. 508 (a beneficial owner is liable under Section 16(b) only if he already owned ten percent of the stock before the purchase at issue). The situation is different when insider status is based on the fact

that the trader is a director or officer of the issuing corporation. As the court held in *Adler*, a director can be found liable under Section 16(b) even if he was not a director at the time he purchased the particular shares at issue. *See Adler*, 267 F.2d at 847. Thus *Adler's* requirement that a public announcement of a dividend occur both before the shares were purchased and before the trader became a director has meaning. In the context of ten percent insiders, however, it would be superfluous to require that a dividend be publicly announced both before purchase and before becoming an insider. The critical question in *Adler* as applied to ten percent owners is whether the shares at issue were purchased before or after the dividend was publicly announced.

Steel Partners was not part of the "profit realized by" Steel Partners from its short-swing purchase and sale of those shares. Accordingly, we reverse the district court's grant of summary judgment in favor of Bell and remand for entry of summary judgment in favor of Steel Partners.

JACOBS, Circuit Judge, dissenting:

It is stipulated that Steel Partners, a corporate insider by statutory definition, purchased the Bell shares at issue in October 1999 for $5.30 per share, received an extraordinary per share distribution of $1.30 from liquidation of company assets, sold the shares at $6.37 on December 20, and disgorged under § 16(b) only the $1.07 difference between the purchase price and sale price. The question presented is whether the additional $1.30 pocketed by Steel Partners is "any profit" under § 16(b) of the Securities and Exchange Act of 1934. 15 U.S.C. § 78p(b) (West 2001).

The majority frames that question in terms of the nature and extent of the insider's influence or knowledge concerning the distribution, and concludes that the extraordinary distribution should be disregarded for these purposes because Steel Partners did not cause or influence the liquidation resulting in the distribution and had no non-public information about those transactions. I respectfully dissent (1) because I disagree with the framing of the issue, and (2) because I conclude that, even as the issue is framed by the majority, the extraordinary distribution should be disgorged.

1

The extraordinary distribution represented the proceeds from liquidation of a part of the company's assets. It follows that the market price per share thereafter would be reduced by that amount unless the company's assets increased in the interim, or its prospects improved, to offset the distribution of proceeds from the asset liquidation. The $1.30 paid in the distribution was about a quarter of the company's per share value when Steel Partners purchased the shares; yet the shares were worth as much (and more) when Steel Partners sold them. The relevant inquiry is whether the increment that caused the sale price to equal or exceed the $5.30 purchase price should count as "any profit," notwithstanding an intervening distribution of proceeds from the liquidation of a quarter of the company's assets; that inquiry has nothing to do with Steel Partners' role in the distribution.

At the end of the various transactions, Steel Partners had absorbed the $1.30 value from the sale of a quarter of the company's assets, and yet sold its shares at an undiminished price. It is proverbial that the cake Steel Partners now has cannot be the cake it has eaten. Incremental value, from some source or for some reason, caused the sale price in December to equal or exceed its share price in October notwithstanding the intervening liquidation and distribution of assets. Because Steel Partners was a statutory insider that whole time, it is required to disgorge that increment as profit—regardless of whether it had power or inside information about the distribution, or about anything else.

2

The majority concedes that section 16(b) would "ordinarily" require Steel Partners to disgorge the extraordinary distribution, but concludes nevertheless that disgorgement is inappropriate under the facts and circumstances of this case. In so doing, the majority cites a judicially created exception to § 16(b), which had been narrowly limited to dividends regularly paid in the ordinary course, and expands it to

preclude the disgorgement of a "dividend" that distributes a quarter of the company's assets. I believe that this approach undermines the statutory purpose of § 16(b).

### A

Section 16(b) presumes that the insider possesses improper knowledge and imposes "strict liability for all transactions that meet its mechanical requirements." *Gwozdzinsky v. Zell/Chilmark Fund,* 156 F.3d 305, 308, 310 (2d Cir.1998). By its plain language, the statute requires that "any profit" be disgorged, regardless of the insider's actual knowledge or intent.

We have previously defined "any profit" under § 16(b) as "the total result of the ownership of the particular shares, i.e., the net result of the purchase, *ownership benefits,* and sale". *Adler v. Klawans,* 267 F.2d 840, 848–49 (1959) (emphasis added). Under that definition, dividends and distributions should categorically qualify as "ownership benefits". *Cf. Adler,* 267 F.2d at 848 ("A dividend received on a particular share cannot logically be considered as profit separate and apart from the difference between purchase and sale price."); *see also Marquette Cement Mfg. Co. v. Andreas,* 239 F.Supp. 962, 968 (S.D.N.Y. 1965). Because the sum of parts is no greater than the whole, the price of a stock drops immediately after distribution of a dividend. *See* Ross, *et al., Corporate Finance* 462 & n. 1 (Irwin/McGraw–Hill 5th ed. 1999) ("In a world with neither taxes nor transaction costs, the stock price would be expected to fall by the amount of the dividend."). Ordinary dividends build up and get paid out at regular intervals and their value (arguably) is built into a share price that represents the present value of the future dividend stream. But when share price recovers from an extraordinary distribution, it is due to new, positive market information, and the incre-

mental value is "profit" under the statute and as commonly understood.

As the majority emphasizes, however, "[t]he judicial tendency, especially in this circuit, has been to interpret Section 16(b) in ways that are most consistent with legislative purpose, even departing where necessary from the literal statutory language." *Feder v. Martin Marietta Corp.,* 406 F.2d 260, 263 (2d Cir.1969), *cert. denied,* 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970); *Gwozdzinsky,* 156 F.3d at 308, 310 (noting that courts look to policy "to avoid the harsh results of this inflexible rule"). Thus, whether or not a "borderline transaction" should be included as profit under the statute turns ultimately on the degree to which exclusion would "serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County Land Company v. Occidental Petroleum Corp.,* 411 U.S. 582, 595, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *see also Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 424, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) ("Where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders."); *Blau v. Lamb,* 363 F.2d 507, 519 (2d Cir.1966) (noting statutory policy of avoiding "unfair use of inside information by corporate insiders"). To advance this legislative purpose, any benefit (by dividend or otherwise) is deemed "profit" within the meaning of § 16(b), and should be disgorged *"without further inquiry"* if there is *"at least the possibility of abuse."* *Blau,* 363 F.2d at 519 (emphasis added). We have applied this principle of § 16(b) analysis to determine

> [i] whether a "purchase and sale" has in fact occurred, *see Gwozdzinsky,* 156 F.3d at 310 ("[C]ourts have looked

into the substance of borderline transactions alleged to have violated Section § 16(b) ... and, where *the possibility of speculative abuse* was not shown, ... [have] refuse[d] to impose liability even though there was arguably a ... purchase and sale by an insider within six months.") (emphasis added); and

[ii] whether someone qualifies as an insider, *see C.R.A. Realty Corp. v. Crotty*, 878 F.2d 562, 566 (2d Cir.1989) ("The general approach established by our Court ... is consistent with that of the Supreme Court in § 16(b) cases in which the Court has emphasized that *potential access to inside information is the key* to finding liability, rather than rigid application of statutory designations.") (citing *Foremost–McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 251–54, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976)) (emphasis added).

In the past, this Court has exempted from dividends disgorgement in two circumstances only: (1) where the issuer historically issued a modest dividend on a "regular" basis, or (2) where the issuer declared the dividend before the insider attained insider status. *See Blau*, 363 F.2d at 528 (holding that "[where corporation] had paid regular quarterly dividends ... the dividend was not part of a scheme of short-swing speculation"); *Adler v. Klawans*, 267 F.2d 840, 848–849 (2d Cir.1959) (holding that dividends declared before appellant became insider were not subject to profit calculations under § 16(b)). Each exception relies on circumstances that lend themselves to stipulation; thus neither interferes with § 16(b)'s "mechanical," strict penalties. *See Gwozdzinsky*, 156 F.3d at 310 ("The statute, as written, establishes strict liability for all transactions that meet its mechanical requirements.").

*Adler* held that no disgorgement is required [1] where the dividend paid was not in respect of the shares sold; [2] where the trader was not an insider at time of purchase, and the purchase was made after the dividend was declared; and [3] where the trader was not an insider at the time the dividend was declared. *Id.* 848–49. These are circumstances in which the statutory presumption—that an insider is in a position which could be used to influence the sale price—finds no footing. *Id.* at 848 ("Our primary holding simply gives effect to the statutory mandate that, at some moment before making a sale of stock, the insider was in an official position which he *could have used* to influence the sale price.") (emphasis added).

*Blau* held that a regular quarterly dividend was "too incidental" to merit inclusion. *Blau*, 363 F.2d at 528. Such ordinary dividends are excluded because regular payment of a steady dividend by a company enjoying steady profits can be deemed an assumption built into the value of the stock: the value of the anticipated dividend builds up through each quarter and the stock drops by the amount of the dividend as soon as the dividend is paid.

*Blau* assumes that, absent circumstances potentially suggesting otherwise, the payment of a steady dividend in the ordinary course is the time-value of investment in a company that regularly distributes its steady profits, and is not an event upon which an insider can profitably trade. Obviously, however, shares fluctuate for many reasons other than the expectation of regular dividends, even under circumstances in which a regular dividend is one cyclical influence. And it may therefore happen that a down-tick attributable to the recent payment of a dividend may be masked or rapidly recovered by other events that an insider may influence or about which the insider may enjoy inside knowledge. Thus, both *Adler* and *Blau*

allow that "[s]ituations may well arise relative to dividends where they are so inextricably connected with the 'purchase and sale' of stock and possible manipulation by insiders . . . as to compel the formulation of a rule . . . in order to prevent the frustration of the statutory purpose." *Id.* at 849; *see also Blau,* 363 F.2d at 522 n. 22 ("Section 16(b) might apply [to a dividend] if a sale of the common occurred within six months from the purchase of the convertible security.").

Under *Adler* and *Blau,* a dividend *may* be counted as profit where it is received by an insider who thereafter sells the stock (within six months of its purchase), *unless* [i] the dividend was declared before the buyer purchased the stock or before the buyer acquired insider status, *Adler,* 267 F.2d at 848, and [ii] the bracketed purchase and sale take place at about the same interval in a regular cycle of ordinary dividend payments, *Blau,* 363 F.2d at 528.

## B

The majority concedes that neither of these clearly delineated exceptions apply here. *See supra* p. 125. Certainly, the distribution at issue was no ordinary dividend—Bell had paid no dividend for years. *Cf. Blau,* 363 F.2d at 528 (finding dividend to be "regular, quarterly" pay-out to shareholders based on company's "dividend payment history"). The decision to make the $1.30 distribution was prompted by the sale of a division, which is a transaction that is extraordinary rather than regular. Moreover, the dividend was declared and the record date fixed *after* Steel Partners' purchase of the shares.

The majority holds nevertheless that no disgorgement is required because Steel Partners "had neither access to inside information nor control or influence over Bell's corporate affairs," and therefore no

possibility of speculative abuse existed. *See supra* p. 126. The mitigating facts upon which the majority relies are that Steel Partners [i] was mounting an (unsuccessful) hostile takeover of Bell, and had no access to inside information; [ii] had no representative on Bell's Board of Directors; [iii] was not consulted before Bell's decision to declare a cash dividend; and [iv] learned of the decision to pay the disputed dividend along with all other Bell shareholders. These facts do not, however, preclude the possibility of abuse or manipulation, and therefore under *Blau* they do not justify exemption from disgorgement. *See Blau,* 363 F.2d at 519 (requiring disgorgement "without further inquiry" if there is "at least the possibility of abuse").

Steel Partners was a statutory insider at the time the asset sale giving rise to the extraordinary dividend received shareholder approval and was consummated. True, the agreement to engage in that transaction had been announced before Steel Partners bought the shares at issue, but the agreement was subject to approval by Bell stockholders (including Steel Partners, which then controlled more than ten percent), and no doubt other contingencies. Had the asset sale not been consummated (and the dividend not been paid), Steel Partners would have been faced with an undesirable choice—to risk holding the stock for the statutory six-month period, or to sell the stock (at a price reflecting the value of all its divisions) and disgorge the entire profit. Instead, shareholder approval of the asset sale provided Steel Partners with an exit strategy if its takeover bid failed. Once its bid failed, Steel Partners disgorged the capital gains resulting from its short-swing sale, but held onto the dividends.

In any event, it is unsound to assume that hostile bidders are without influence.

**132**

Thus the board of the target may seek to blunt their appeal to other shareholders by preemptively implementing their proposals; and even if the hostile bidders are pariah to the target's board, the board for that reason may arrange for them to go away happy. It does not matter whether such influence exists, or is indulged; the possibility of influence or manipulation is all that matters.

For those reasons, I would affirm the judgment of the district court.