**David PARKER, et al., Plaintiffs,**

v.

**William HURLEY, et al., Defendants.**

**C.A. No. 06–10751–MLW.**

United States District Court,
D. Massachusetts.

Feb. 23, 2007.

Jeffrey A. Denner, Denner Pellegrino LLP, Robert S. Sinsheimer, Denner Associates, P.C., Boston, MA, for Plaintiffs.

John J. Davis, Pierce, Davis & Perritano, LLP, Boston, MA, for Defendants.

Eben A. Krim, Proskauer Rose, LLP, Sarah R. Wunsch, Boston, MA, for Amicus ACLU of Massachusetts, Gay & Lesbian Advocates & Defenders, Human Rights Campaign Foundation, Human Rights Campaign, Lexington C.A.R.E.S, Lexington Teachers Association, Massachusetts Teachers Association, Respecting Differences.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. SUMMARY

Plaintiffs David and Tonia Parker, and Robert and Robin Wirthlin, brought this action in 2006, individually and on behalf of their respective minor children, Jacob and Joshua Parker, and Joseph Wirthlin, Jr. ("Joey"). They are suing various employees of the Lexington, Massachusetts public schools and members of the Lexington School Committee in both their individual and official capacities.[1]

---

1. The plaintiffs charge the following defendants in both their individual and official capacities: the Superintendents of the Town of Lexington Public Schools, William Hurley and Paul B. Ash, Ph.D.; the members of the Town of Lexington School Committee Helen L. Cohen, Thomas R. Diaz, Olga Guttag, Scott Burson, and Thomas Griffith; the director of education in the Town of Lexington, Andre Ravenelle; the principal of the Estabrook Elementary School, Joni Jay; the coordinator of Health Education, Jennifer Wolfrum; and a teacher of the Estabrook Elementary School, Heather Kramer. In addition, the plaintiffs name as a defendant the Town of Lexington.

Massachusetts law prohibits discrimination in public schools based on sex or sexual orientation. It also requires that public school curricula encourage respect for all individuals regardless of, among other things, sexual orientation. Pursuant to these directives, the Massachusetts Department of Education has issued standards which encourage instruction for pre-kindergarten through fifth grade students concerning different types of people and families.

Jacob Parker and Joey Wirthlin are students in a Lexington elementary school. When he was in kindergarten, Jacob was given a book that depicts various forms of families, including one that includes parents of the same gender. When he was in first grade, Joey was read a book about a prince who married another prince. Both books were part of the Lexington school system's effort to educate its students to understand and respect gays, lesbians, and the families they sometimes form in Massachusetts, which recognizes same-sex marriage.

Jacob and Joey's parents each have sincerely held religious beliefs that homosexuality is immoral and that marriage is necessarily only a holy union between a man and a woman. They do not wish to have their young children exposed to views that contradict these beliefs and their teaching of them. The Parkers and Wirthlins allege that the defendants are attempting to "indoctrinate" their children with the belief that homosexuality and same-sex marriages are moral, and to "denigrate" the contrary view that they wish to instill in their children.

The Parkers and Wirthlins assert that the defendants' conduct violates their rights under the United States Constitution to raise their children and to the free exercise of their religion. They also contend that the defendants have violated the laws of the Commonwealth of Massachu-

setts, including the statute that requires that parents be given notice and an opportunity to exempt their children from any curriculum that "primarily involves human sexual education or human sexuality issues." M.G.L. c. 71, § 32A.

The defendants have moved to dismiss this case. As explained in detail in this Memorandum, plaintiffs have not alleged facts which constitute a violation of the Constitution or any law of the United States. Therefore, their federal claims are being dismissed with prejudice. Plaintiffs' state law claims are also being dismissed, but without prejudice to their being reinstituted in the courts of the Commonwealth of Massachusetts.

In summary, the court must dismiss plaintiffs' federal claims because this case is not distinguishable in any material respect from *Brown v. Hot, Sexy and Safer Productions,* 68 F.3d 525 (1st Cir.1995). In *Brown,* the First Circuit held that the constitutional right of parents to raise their children does not include the right to restrict what a public school may teach their children and that teachings which contradict a parent's religious beliefs do not violate their First Amendment right to exercise their religion. *Id.* at 534, 539. The reasoning and holding of *Brown* have been reaffirmed by the First Circuit, have been found to be persuasive by many other Courts of Appeals in comparable cases, and have not been undermined by any decision of the Supreme Court. Therefore, *Brown* constitutes binding precedent which dictates the decision to dismiss plaintiffs' federal claims in this case.

In essence, under the Constitution public schools are entitled to teach anything that is reasonably related to the goals of preparing students to become engaged and productive citizens in our democracy. Diversity is a hallmark of our nation. It is increasingly evident that our diversity in-

cludes differences in sexual orientation. Our nation's history includes a fundamental commitment to promoting mutual respect among citizens in our diverse nation that is manifest in the First Amendment's prohibitions on establishing an official religion and restricting the free exercise of religious beliefs on which plaintiffs base some of their federal claims. Our history also includes instances of individual and official discrimination against gays and lesbians, among others. It is reasonable for public educators to teach elementary school students about individuals with different sexual orientations and about various forms of families, including those with same-sex parents, in an effort to eradicate the effects of past discrimination, to reduce the risk of future discrimination and, in the process, to reaffirm our nation's constitutional commitment to promoting mutual respect among members of our diverse society. In addition, it is reasonable for those educators to find that teaching young children to understand and respect differences in sexual orientation will contribute to an academic environment in which students who are gay, lesbian, or the children of same-sex parents will be comfortable and, therefore, better able to learn.

When, as here, federal claims are dismissed at the outset of a case, the related state law claims should usually be dismissed as well, without prejudice to their being pursued in state court. It is particularly appropriate that the state law claims in this case now be dismissed.

As indicated earlier, those claims include plaintiffs' contention that the defendants have violated the Massachusetts statute which requires that parents be given notice and an opportunity to exempt their children from any curriculum that "primarily involves human sexual education or human sexuality." M.G.L. c. 71, § 32A. The defendants contend that the statute does not provide private individuals the power to sue to enforce it. They also argue that the conduct in question in this case is not covered by the statute. The courts of the Commonwealth of Massachusetts have not decided these issues. It is most appropriate to allow those courts to decide authoritatively the meaning of the Massachusetts statute.

Therefore, all of plaintiffs' claims are being dismissed. However, the limits of what is now being decided should be recognized.

Parents do have a fundamental right to raise their children. They are not required to abandon that responsibility to the state. The Parkers and Wirthlins may send their children to a private school that does not seek to foster understandings of homosexuality or same-sex marriage that conflict with their religious beliefs. They may also educate their children at home. In addition, the plaintiffs may attempt to persuade others to join them in electing a Lexington School Committee that will implement a curriculum that is more compatible with their beliefs. However, the Parkers and Wirthlins have chosen to send their children to the Lexington public schools with its current curriculum. The Constitution does not permit them to prescribe what those children will be taught.

It should also be recognized that while the Constitution does not compel the defendants to revise the Lexington elementary school curriculum, or to permit the Parkers and Wirthlins to exempt their children from teaching about homosexuality or same-sex marriage, it also does not prohibit the defendants from voluntarily accommodating the parents' concerns if there is a reasonable way to do so. Finding a reasonable accommodation may be a challenging task. Allowing parents to exempt their children from classes primarily involving human sexual education may not

injure the value of those classes for the students who remain. However, as Ralph Waldo Emerson wrote in his journal, " 'I pay the school master', but 'tis the school boys that educate my son.' " James O. Freedman, *Idealism and Liberal Education* 63 (1999). An exodus from class when issues of homosexuality or same-sex marriage are to be discussed could send the message that gays, lesbians, and the children of same-sex parents are inferior and, therefore, have a damaging effect on those students. *Cf. Brown v. Board of Education*, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[2] It might also undermine the defendants' efforts to educate the remaining other students to understand and respect differences in sexual orientation.

Nevertheless, it is evident to the court that this dispute involves parents who are passionately devoted to their children, many people who support them, and committed educators and their many supporters as well. Profound differences in religious beliefs are also a hallmark of our diverse nation. It is often in a community's interest to try to find a reasonable way to accommodate those differences. Litigation of the remaining state law claims in state court will result in a judicial decision of the issues presented. It is not likely to end the intense disagreement between the parties or the divisive impact of it on their community. Therefore, the parties may wish to attempt to mediate their dispute before resuming their legal battle in state court.

## II. FACTS

The following facts are alleged in the complaint, derived from documents central to plaintiffs' allegations or specifically referenced in the complaint, or describe established laws and policies of the Commonwealth of Massachusetts as reflected in its official records. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993); *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 16–17 (1st Cir.1998).

Since at least 1993, Massachusetts has by statute required that public schools not discriminate based on sex or sexual orientation. *See* M.G.L. c. 76, § 5. Moreover, Massachusetts law has since 1993 required that the Board of Education and the Commissioner of Education develop standards for curricula for all public elementary and secondary schools "to inculcate respect for the cultural, ethnic and racial diversity of the commonwealth ... and to avoid perpetuating gender, cultural, ethnic or racial stereotypes." M.G.L. c. 69, § 1D.

Accordingly, the Massachusetts Department of Education promulgated regulations which require that "[a]ll public school systems shall, through their curricula, encourage respect for the human and civil rights of all individuals regardless of race, color, sex, religion, national origin or sexual orientation." 603 C.M.R. § 26.06(1). Pursuant to these directives, the Commissioner of the Department of Education issued curricula frameworks for pre-kindergarten through fifth grade that encourage instruction that describes "different types of families" and "the concepts of prejudice and discrimination." Massachusetts Comprehensive Health Curriculum Framework (1999) at 30, 33. These lessons are intended to contribute to the creation of "a safe and supportive environ-

---

**2.** The Supreme Court wrote in *Brown*, 347 U.S. at 494, 74 S.Ct. 686:

Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is greater when it has the sanction of law, for the policy of separating the races is usually interpreted as denoting the inferiority of the Negro group. A sense of inferiority affects the motivation of a child to learn.

ment where individual similarities and differences are acknowledged." *Id.* at 5.

In 2003, the Supreme Judicial Court of Massachusetts held that the state's ban on same-sex marriages violated the Commonwealth's constitution. *See Goodridge v. Department of Public Health,* 440 Mass. 309, 798 N.E.2d 941 (2003). This decision was based, in part, on the finding that the "ban work[ed] a deep and scarring hardship on a very real segment of the community for no rational reason." *Id.* at 341, 798 N.E.2d 941.

Jacob Parker is a student in the Lexington, Massachusetts Estabrook Elementary School. In 2005, when he was a six year-old kindergarten student, Jacob brought home from school the book *Who's in a Family* as part of a Diversity Book Bag program. The Lexington school system uses the Diversity Book Bag program to strengthen the connections among its schoolchildren, and to build an atmosphere of tolerance and respect for different cultures, races, and family structures. *Who's in a Family* includes illustrations of different forms of families, including children with parents of different genders, children with parents of the same gender, children with parents of different races, and a single parent family. In 2006, this book was in Jacob's first grade reading center. *Molly's Family* was also in that reading center. *Molly's Family* teaches about different kinds of families, focusing on a student whose parents are a same-sex couple.

Joey Wirthlin also attends the Estabrook Elementary School. In 2006, when he was seven years-old, his first grade teacher read *King and King* aloud to his class. *King and King* is a fairytale about a prince ordered by his mother, the queen, to find a princess to marry. The prince rejects each of the princesses he meets. Ultimately, the prince meets another prince. The two fall in love, marry, and live happily ever after. The book concludes with a cartoon kiss between the young couple.

David and Tonia Parker are Jacob's parents. Joseph and Robin Wirthlin are Joey's parents. The Parkers and Wirthlins have sincerely held religious beliefs that homosexuality is immoral and that marriage necessarily means a holy union between a man and a woman. They do not wish to have their young children exposed to views that contradict these beliefs. The Parkers and Wirthlins contend that the defendants used *Who's in a Family* and *King and King* to "indoctrinate" their young children with the beliefs that homosexuality and same-sex marriages are moral and acceptable, and that the Parkers' and Wirthlins' beliefs and teachings to the contrary are incorrect. Plaintiffs also assert that the defendants acted intentionally to "denigrate" their sincere and deeply held religious beliefs.

The Parkers and Wirthlins informed the defendants that the books and lessons in dispute are contrary to their religious beliefs, and asserted that the use of those books violated their parental rights to raise their children. They requested that the Lexington schools not expose Jacob, his younger brother Josh Parker, or Joey to any material or discussion concerning homosexuality or same-sex unions without providing notification to their respective parents and an opportunity for the parents to opt out of those lessons on behalf of their children.

Pursuant to M.G.L. c. 71, § 32A, Lexington has a policy which allows students to opt out of curriculum that "primarily involves human sexual education or human sexuality issues." However, the defendants did not construe this policy to require offering this option to teaching concerning homosexuality or same-sex marriages. Asserting that the Parkers'

and Wirthlins' requests were not practical, the defendants denied them.

The Superintendent of Schools for Lexington, defendant Paul Ash, explained this decision in several public statements. The plaintiffs assert that these statements were inaccurate and intentionally demeaning to them.

In 2006, the Parkers and the Wirthlins filed this suit individually and on behalf of their children. They allege violations of both federal and state law. More specifically, the plaintiffs assert that their federal constitutional rights to privacy, to raise their children, and to the free exercise of their religion are being violated by the defendants individually and in conspiracy with each other. They also contend that defendants' conduct violates the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11, and the statute which requires that parents be given notice and an opportunity to exempt their children from curriculum which "primarily involves human sexual education or human sexuality issues," M.G.L. c. 71, § 32A.

Plaintiffs seek compensatory damages and punitive damages. They also request injunctive relief that would require the defendants to: notify the plaintiff parents of any adult initiated classroom discussion of sexuality, gender identity, or forms of marriage until their children are in the seventh grade; allow the plaintiff parents to exempt their children from any such discussion; permit the plaintiff parents to observe silently and record any such discussion; and prohibit "materials graphically depicting homosexual physical contact," evidently including *King and King*, from being submitted to the students until seventh grade. Complaint at 23.

Defendants moved to dismiss this case, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief may be granted. With the agreement of the plaintiffs, the court received a brief in support of the motion to dismiss from several *amici curiae*. Plaintiffs opposed the motion to dismiss. A hearing was held on February 7, 2007.

## III. ANALYSIS

### A. *The Applicable Standard*

In considering a motion to dismiss under Rule 12(b)(6) a court "must take the allegations of the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir.1993). " 'A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Miranda v. Ponce Fed'l Bank*, 948 F.2d 41, 44 (1st Cir.1991) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

This "highly deferential" standard of review "does not mean, however, that a court must (or should) accept every allegation made by the complainant, no matter how conclusory or generalized." *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992). Rather, a court should "eschew any reliance on bald assertions, unsupportable conclusions, and 'opprobrious epithets.' " *Chongris v. Board of Appeals of Town of Andover*, 811 F.2d 36, 37 (1st Cir.1987) (*quoting Snowden v. Hughes*, 321 U.S. 1, 10, 64 S.Ct. 397, 88 L.Ed. 497 (1944)).

### B. *The Federal Claims Must Be Dismissed With Prejudice*

The defendants assert that even accepting the allegations in the complaint as true, the plaintiffs have failed to state a violation of their federal constitutional rights. They also contend that, at a minimum, the individual defendants have qualified immunity with regard to the claims against them and, therefore, cannot be held personally liable to plaintiffs.

"Before reaching the issue of qualified immunity the court must ascertain whether the plaintiffs have asserted a violation of a constitutional right at all." *Brown*, 68 F.3d at 531; *see also Watterson*, 987 F.2d at 7; *Singer v. Maine*, 49 F.3d 837, 844 (1st Cir.1995). As indicated earlier and described below, even if proven, the allegations in the complaint would not establish a violation of plaintiffs' federal constitutional rights. Therefore, defendants' motion to dismiss the federal claims is meritorious.

It is axiomatic that "[u]ntil a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority. *See Sarzen v. Gaughan*, 489 F.2d 1076, 1082 (1st Cir.1973) (explaining that *stare decisis* requires lower courts to take binding precedents 'at face value until formally altered.')." *Eulitt v. Maine Department of Education*, 386 F.3d 344, 349 (1st Cir.2004). The instant case is in all material respects analogous to *Brown, supra*, in which the First Circuit affirmed the dismissal of plaintiffs' federal claims. The reasoning of *Brown* has not been cast into question by either subsequent decisions of the First Circuit or the Supreme Court. Therefore, this court must follow *Brown* and dismiss the federal claims in this case.

1. *The Privacy and Substantive Due Process Claim*

In *Brown*, 68 F.3d at 529, two fifteen year-old high school students were required to attend a program to teach AIDS awareness. Although school policy contemplated obtaining prior parental permission to attend, those students' parents "were not given advance notice of the content of the Program or an opportunity to excuse their children from attendance at the assembly." *Id.* at 530. *See also id.* at 535 ("the parents were not given advance notice of the contents of the Program or an opportunity to opt out.").

In *Brown*, the First Circuit recognized that the "Fourteenth Amendment provides that '[n]o state shall ... deprive any person of life, liberty, or property without due process of law'. U.S. Const. amend. XIV." *Id.* at 531. The First Circuit explained that a plaintiff can assert a viable substantive due process claim by alleging a "deprivation of an identified liberty or property interest protected by the Fourteenth Amendment." *Id.*

In *Brown*, the plaintiff parents alleged that their right to substantive due process was infringed because "the defendants violated their privacy right to direct the upbringing of their children and educate them in accord with their own views." *Id.* at 532. The Parkers and the Wirthlins make the same claim in this case, asserting that "the defendants intruded upon and impaired the adult plaintiffs' clearly established substantive Due Process rights under the Fifth and Fourteenth Amendments, as parents and guardians to direct the moral upbringing of their children and the clearly established rights of the minor children to such upbringing." Complaint, ¶ 71.

In *Brown*, the First Circuit assumed for the purpose of its analysis that "the right to rear one's children is fundamental." 68 F.3d at 533. Interpreting and applying the Supreme Court precedents of *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) and *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the First Circuit wrote that:

The *Meyer* and *Pierce* cases, we think, evince the principle that the state cannot prevent parents from choosing a specific educational program-whether it be religious instruction at a private school or instruction in a foreign language. That

is, the state does not have the power to standardize its children or "foster a homogenous people" by completely foreclosing the opportunity of individuals and groups to choose a different path of education. *Meyer,* 262 U.S. at 402, 43 S.Ct. at 627–28, discussed in, [Laurence H. Tribe, American Constitutional Law, § 15–6 at 1319–20 (1988)]. We do not think, however, that this freedom encompasses a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children. *See* [Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure, (2d ed.1992)]. We think it is fundamentally different for the state to say to a parent, "You can't teach your child German or send him to a parochial school," than for the parent to say to the state, "You can't teach my child subjects that are morally offensive to me." The first instance involves the state proscribing parents from educating their children, while the second involves parents prescribing what the state shall teach their children. If all parents had a fundamental constitutional right to dictate individually what the schools teach their children, the schools would be forced to cater a curriculum for each student whose parents had genuine moral disagreements with the school's choice of subject matter. We cannot see that the Constitution imposes such a burden on state educational systems, and accordingly find that the rights of parents as described by *Meyer* and *Pierce* do not encompass a broad-based right to restrict the flow of information in the public schools.

*Id.* at 533–34, 45 S.Ct. 571. Therefore, the First Circuit found that plaintiffs' substantive due process claim had been properly dismissed.

■■■ The First Circuit's reasoning and decision in *Brown* requires dismissal of the substantive due process claim in the in-

stant case as well. The holding that parents do not have a constitutionally protected liberty interest that permits them to prescribe what the state may teach their children has not been "cast into disrepute by supervening authority." *Eulitt,* 386 F.3d at 349. To the contrary, in 2004 the First Circuit reiterated that while parents have a general liberty interest that permits them to direct the upbringing and education of their children, "this constitutional right is limited in scope." *Pisacane v. Desjardins,* 115 Fed.Appx. 446, 450 (1st Cir. Oct.18, 2004). *Pisacane* involved a school's alleged "refusal to let [a parent] dictate to the school about [a] science text book." *Id.* In affirming the granting of the defendants' motion for summary judgment, the First Circuit wrote concerning a parent's right to raise his children:

> In *Brown* we ruled that the right embraces the principle that the state cannot prevent parents from choosing for their child a specific education program but did not include the right to dictate the curriculum at the public school to which parents have chosen to send their children. 68 F.3d at 533–34.
>
> \*    \*    \*    \*    \*    \*
>
> The appellees asserted refusal to let Pisacane dictate to the school about the science book ... would not violate the parental due process right. As said, the right does not include parental control over a public school's curriculum *Brown,* 68 F.3d at 533–34.

*Id.*

*Brown* not only remains the law of the First Circuit, it has also been found to be persuasive in every other circuit that has discussed it in defining the scope of a parent's right to raise his or her children. *See Leebaert v. Harrington,* 332 F.3d 134, 141 (2d Cir.2003) (upholding refusal to exempt student from mandatory health education course and stating, "we agree [with

*Brown* ] that *Meyer, Pierce,* and their progeny do not begin to suggest the existence of a fundamental right of every parent to tell a public school what his or her child will and will not be taught"); *C.N. v. Ridgewood Board of Education,* 430 F.3d 159, 182 (3rd Cir.2005) (affirming finding that administration of a questionnaire to students did not violate parents' liberty interest and noting that Brown, among other decisions, "held that in certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum"); *Littlefield v. Forney,* 268 F.3d 275, 291 (5th Cir.2001) (*citing Brown* in support of the holding that "[w]hile Parents may have a fundamental right in the upbringing and education of their children, this right does not cover the Parents' objection to the school uniform policy"); *Blau v. Fort Thomas Public School District,* 401 F.3d 381, 395–96 (6th Cir.2005) (*citing Brown* in holding that parent does not have a right to exempt his child from a school dress code); *Swanson v. Guthrie Independent School District No. I–L.,* 135 F.3d 694, 700 (10th Cir.1998) (*citing Brown* in holding that a school's refusal to allow a student to attend classes part-time presented "no colorable claim of infringement on the constitutional right to direct a child's education"); *see also Herndon v. Chapel Hill–Carrboro City Board of Education,* 89 F.3d 174, 176 (4th Cir.1996) (holding, without *citing Brown,* that requiring high school students to perform public service does not violate parents' right to control the education of their children).

Contrary to plaintiffs' contention, the Supreme Court's decision in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), does not undermine the authority of *Brown.* In *Troxel,* the plurality stated that *Meyers* and *Pierce* established that there is a fundamental liberty "interest of parents in the care, custody, and control of their children." 530 U.S. at 65, 120 S.Ct. 2054. It then held that as applied to the facts of *Troxel,* a state statute allowing a court to grant visitation rights to any person violated that fundamental right. *Id.* at 73, 120 S.Ct. 2054.

In *Troxel,* the plurality identified a fundamental liberty interest of "parents, but left the scope of that right undefined." *Leebaert,* 332 F.3d at 142. The Second Circuit explained that while the plurality in *Troxel* discussed *Meyer* and *Pierce:*

[T]here is nothing in *Troxel* that would lead us to conclude from the Court's recognition of a parental right in what the plurality called "the care, custody, and control" of a child with respect to visitation rights that parents have a fundamental right to the upbringing and education of the child that includes the right to tell public schools what to teach or what not to teach him or her.

*Id. See also Littlefield,* 268 F.3d at 291 ("*Troxel* does not change [our] reasoning in the context of parental rights concerning public education.").

In *Brown* the First Circuit essentially anticipated *Troxel.* The First Circuit wrote in *Brown* that "[w]e need not decide here whether the right to rear one's children is fundamental because we find that, even if it were, the plaintiffs have failed to demonstrate an intrusion of constitutional magnitude." 68 F.3d at 533. After thus assuming, without finding, that the right to raise one's children is fundamental, the First Circuit held that this right does not "encompass [ ] a fundamental constitutional right to dictate the curriculum at the public school to which they have chosen to send their children." *Id.* In view of the foregoing, this court concludes that *Troxel* has not unmistakably undermined the authority of *Brown. See Eulitt,* 386 F.3d at 349. Therefore, *Brown* remains precedent that establishes the law which this court must apply in this case.

Plaintiffs' efforts to distinguish *Brown* factually are also not persuasive. Plaintiffs assert that "it appears that the parents in *Brown* were in fact given some sort of prior notice and an opt out option." Plaintiffs' Memorandum in Opposition to Amicus Brief at 7. This contention is based on a misreading of *Brown*. In *Brown*, the First Circuit noted that the School Committee's policy provided for notice and an opportunity for parents to exempt their children from the presentation on human sexuality. 68 F.3d at 530. It twice expressly stated, however, that the required notice and opportunity to opt out were not given. *Id.* at 530, 534.

Nor does the young age of the students in the instant case distinguish *Brown*. In the different context of deciding whether government conduct violates the Establishment Clause of the First Amendment by sending a message that the government is endorsing religion, the Supreme Court has found both the school setting and the young age of the children to be relevant. As the Seventh Circuit has summarized it:

> [A]lleged Establishment Clause violations in grade-school settings present heightened concerns for courts. These concerns were voiced in *School District of Grand Rapids v. Ball*, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985): "The symbolism of a union between church and state is most likely to influence children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as of free and voluntary choice." This concern for the age of the audience is of particular importance when the setting for the alleged violation is a public school. In this setting, "[t]he State exerts great authority and coercive power through mandatory attendance requirements, and because of students' emulation of teachers as role models and the children's susceptibility to peer pressure."

*Edwards v. Aguillard*, 482 U.S. 578, 584, 107 S.Ct. 2573, 2578, 96 L.Ed.2d 510 (1987).

*Sherman v. Community Consolidated School District 21 of Wheeling Township*, 8 F.3d 1160, 1163 (7th Cir.1993). *See also Spacco v. Bridgewater School Department*, 722 F.Supp. 834, 841 (D.Mass.1989) (Wolf, J.) (plaintiffs made a strong showing that holding public elementary school classes in a church violates the Establishment Clause in part because "many of those affected ... are impressionable, young children."). However, plaintiffs have repeatedly confirmed that they are not asserting an Establishment Clause claim in this case.

The reason for the constitutional concern regarding young school children for Establishment Clause purposes does not apply to plaintiffs' substantive due process and Free Exercise Clause claims in this case. The Establishment Clause prohibits government conduct that has the effect of endorsing religion. *See County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 592, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). However, the very purpose of schools is the " 'preparation of individuals for participation as citizens' [and, therefore,] local education officials may attempt 'to promote civic virtues' ... 'that awake[n] the child to cultural values.' " *Board of Education v. Pico*, 457 U.S. 853, 876, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (Blackmun, J., concurring) (*quoting Ambach v. Norwick*, 441 U.S. 68, 80, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979), and *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954)). Schools are expected to transmit civic values. *See Plyler v. Doe*, 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Ambach*, 441 U.S. at 76, 99 S.Ct. 1589. In essence, the Supreme Court has made clear that while the state may not expressly or indirectly endorse a particular religion or suggest

that religious beliefs are officially preferred over other beliefs, the state is expected to teach civic values as part of its preparation of students for citizenship.

Neither the Supreme Court nor the First Circuit have suggested that parents have constitutional rights concerning public elementary school students that are different or greater than their rights concerning older students. Rather, in *Runyon v. McCrary*, 427 U.S. 160, 165, 177, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), the Supreme Court held that prohibiting racial discrimination in admissions to private nursery schools, among others, did not violate parents' rights to direct the upbringing and education of their children. In *Brown*, the First Circuit did not write anything that suggests that it would have found a parental right to restrict what could be taught to elementary school students when it held that parents had no such right with regard to high school students. *See* 68 F.3d at 532–34.

In *Fields*, the Ninth Circuit held that the rights of parents were not infringed by the distribution of a survey containing questions about sex to elementary school students. The Ninth Circuit relied on *Brown* in reaching its conclusion, writing:

> We agree with and adopt the First Circuit's analysis. *Meyer, Pierce*, and their progeny "evince the principle that the state cannot prevent parents from choosing a specific educational program," but they do not afford parents a right to compel public schools to follow their own idiosyncratic views as to what information the schools may dispense. Parents have a right to inform their children when and as they wish on the subject of sex; they have no constitutional right, however, to prevent a public school from providing its students with whatever information it wishes to provide, sexual or otherwise, when and as

the school determines that it is appropriate to do so.

427 F.3d at 1205–06. *See also Littlefield*, 268 F.3d at 279, 290 (relying on *Brown* in finding that district-wide, mandatory uniform policy, evidently covering elementary school students, did not violate parental rights).

In *C.N.*, the Third Circuit relied in part on *Brown* in finding in connection with a motion for summary judgment that the use of a questionnaire seeking details of middle and high school students' personal lives did not violate their parents' rights to direct their upbringing. 430 F.3d at 182–83, 185. As plaintiffs here emphasize, in doing so the Third Circuit wrote:

> [W]hile it is true that parents, not schools, have the primary responsibility "to inculcate moral standards, religious beliefs, and elements of good citizenship," [*Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir.2000)], a myriad of influences surround middle and high school students everyday, many of which are beyond the strict control of the parent or even abhorrent to the parent. We recognize that introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority, but conclude that the survey in this case did not intrude on parental decision-making authority in the same sense as occurred in *Gruenke*. A parent whose *middle or high school* age child is exposed to sensitive topics or information in a survey remains free to discuss these matters and to place them in the family's moral or religious context, or to supplement the information with more appropriate materials. *School Defendants in no way indoctrinated the students in any particular outlook on these sensitive topics;* at most, they may have introduced a few topics unknown to certain

individuals. We thus conclude that the survey's interference with parental decision-making authority did not amount to a constitutional violation.

*Id.* at 185 (emphasis added). In reaching this conclusion, the Third Circuit noted that it was not holding, "as did the panel in *Fields v. Palmdale School District,* 427 F.3d 1197 (9th Cir.2005), that the right of parents under the *Meyer–Pierce* rubric does not extend beyond the threshold of the school door.' " *Id.* at n. 26.

The Third Circuit's rejection of what is characterized as the "categorical approach" of *Fields, id.,* and its repeated references to the children as middle or high school students suggest that it has left open the possibility that the age of the students at issue might in some case make a difference. However, this suggestion does not persuade this court either that the instant case is factually different than *Brown* in any material respect or that *Brown* has "unmistakably been cast into disrepute by supervening authority." *Eulitt,* 386 F.3d at 349.

This conclusion is not qualified by the fact that in *C.N.,* the Third Circuit stated that the students were not being "indoctrinated" and in the instant case plaintiffs allege that their children are being "indoctrinated." As explained earlier, in deciding a motion to dismiss, a court must not rely on, among other things, " 'opprobrious epithets.' " *Chongris,* 811 F.2d at 37 (*quoting Snowden,* 321 U.S. at 10, 64 S.Ct. 397). "Indoctrination" is a pejorative term for "teaching." Among other things, "indoctrination" is defined as "to teach to accept a system of thought uncritically." *Websters New Riverside Dictionary* (1984 ed) at 624. It is, obviously, the duty of schools to teach. The complaint, even when read in the light most favorable to plaintiffs, indicates that "[a] parent whose ... child is exposed to sensitive topics or information ... remains free to discuss these matters and place them in the family's moral or religious context ..." *C.N.,* 430 F.3d at 185.[3] Therefore, the characterization of the use of the books at issue as "indoctrination" does not distinguish the instant case from *Brown.*[4]

In view of the foregoing, *Brown's* holding that parents do not have a fundamental liberty interest that permits them to prescribe the curriculum for their children means that the defendants' use of the books at issue and related teaching is constitutionally permissible if there is a rational basis for the instruction. *See Immediato v. Rye Neck Sch. Dist.,* 73 F.3d 454, 461 (2d Cir.1996) (rational basis review for secular objections); *Leebaert,* 332 F.3d at 142–143 (extending *Immediato* to cases in which plaintiff's objections are religiously motivated); *Herndon,* 89 F.3d at 179 (explaining that under *Runyon,* curricular choices are subject to reasonable regulation); *Littlefield,* 268 F.3d at 291 (same); *Blau,* 401 F.3d at 393, 396 (all governmental action that does not impinge on fundamental rights is subject to rational basis review); *Fields,* 427 F.3d at 1208 ("govern-

---

**3.** Although not material to the analysis of the motion to dismiss, the court notes that the devoted plaintiff parents in this case have demonstrated their capacity to inform their children of views that contradict those to which the students are being introduced at school.

**4.** At the February 7, 2007 hearing the parties submitted the books at issue, which may be considered in deciding the motion to dismiss because they are central to the complaint. *See Watterson,* 987 F.2d at 3; *Beddall,* 137 F.3d at 16–17. The court has reviewed them. *Who's in a Family* and *Molly's Family* each describe many different types of families and do not suggest the superiority of any paradigm, let alone families headed by members of the same-sex. The premise of *King and King* is that men usually marry women, but that some men are happier marrying another man.

ment actions that do not affect fundamental rights or liberty interests and do not involve suspect classifications will be upheld if it they are rationally related to a legitimate state interest"); *Swanson v. Guthrie Indep. Sch. Dist. No. I–L,* 135 F.3d 694, 703 (10th Cir.1998) (with regard to a neutral rule of general applicability defendants must prove only a reasonable relationship to a legitimate purpose).

■ "In cases involving rationality review, a court must apply substantially the same analysis to both substantive due process and equal protection challenges." *Eastern Enterprises v. Chater,* 110 F.3d 150, 159 (1st Cir.1997) *overturned on other grounds at Eastern Enterprises v. Apfel,* 524 U.S. 498, 537, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Rational basis review requires that government action correlate to a legitimate governmental interest. *See PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28, 31–32 (1st Cir.1991). The fit between means and ends need not be tight—it need only be "plausible." *FCC v. Beach Communications,* 508 U.S. 307, 313–314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Moreover, the constitution demands only that the legitimate governmental purpose be conceivable, not actual. *Id.* at 315, 113 S.Ct. 2096. In essence, rational basis review "is a paradigm of judicial restraint." *Id.* at 313–314, 113 S.Ct. 2096 (1993).

Plaintiffs argue that defendants' alleged conduct violates their fundamental liberty interest in raising their children and, therefore, heightened scrutiny is required concerning the constitutionality of that conduct. They have not asserted that there is not a rational basis for the defendants' decisions about what to teach.

In any event, such a rational basis exists. "[A]s Thomas Jefferson pointed out early in our history ... education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Wisconsin v. Yoder,* 406 U.S. 205, 221, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). As indicated earlier, the Supreme Court has recognized " 'the public schools as a most vital civic institution for the preservation of a democratic system of government,' *School District of Abington v. Schempp,* 374 U.S. 203, 230, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring), and as the primary vehicle for transmitting the 'values on which our society rests.' *Ambach v. Norwick,* 441 U.S. 68, 76, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979)." *Plyler,* 457 U.S. at 221, 102 S.Ct. 2382.

One of the most fundamental of those values is mutual respect. Indeed, our nation's devotion to such respect is manifest in the First Amendment itself, which prohibits the majority from establishing an official religion or prohibiting the exercise of any sincere religious belief, no matter how abhorrent it may be to many or most people.[5]

Students today must be prepared for citizenship in a diverse society. *See Grutter v. Bollinger,* 539 U.S. 306, 330, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) ("the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints"). As increasingly recognized, one dimension of our nation's diversity is differences in sexual orientation. In Massachusetts, at least, those differences may result in same-sex marriages.

**5.** The First Amendment states, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. These requirements also apply to the states. *See McCreary County v. ACLU,* 545 U.S. 844, 853, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005).

In addition, as described earlier, Massachusetts law prohibits discrimination based on sexual orientation. M.G.L. c. 76, § 5. Consistent with this, the Department of Education requires that all public schools teach respect for all individuals regardless of, among other things, sexual orientation. 603 C.M.R. § 26.06(1). It also encourages instruction concerning different types of families. Massachusetts Comprehensive Health Curriculum Framework at 30, 33. Some families are headed by same-sex couples.

The alleged conduct of the defendants at issue in this case was responsive to these requirements and standards. In view of the value to the community of preparing students to respect differences in their personal interactions with others and in their future participation in the political process, the conduct at issue in this case is rationally related to the goal of preparing them for citizenship. It is also rationally related to the goal of eradicating what the Massachusetts Supreme Judicial Court characterized as the "deep and scarring hardship" that the ban on same-sex marriages imposed "on a very real segment of the community for no rational reason." *Goodridge*, 440 Mass. at 341, 798 N.E.2d 941.

Moreover, attempting to teach young, elementary school students to respect gays and lesbians is also rationally related to the legitimate pedagogical purpose of fostering an educational environment in which gays, lesbians, and the children of same-sex parents will be able to learn well. As the Ninth Circuit has explained:

> The demeaning of young gay and lesbian students in a school environment is detrimental not only to their psychological health and well-being, but also to their educational development. Indeed, studies demonstrate that "academic underachievement, truancy, and dropout are prevalent among homosexual youth and are the probable consequences of violence and verbal and physical abuse at school." One study has found that among teenage victims of anti-gay discrimination, 75% experienced a decline in academic performance, 39% had truancy problems and 28% dropped out of school. Another study confirmed that gay students had difficulty concentrating in school and feared for their safety as a result of peer harassment, and that verbal abuse led some gay students to skip school and others to drop out altogether. Indeed, gay teens suffer a school dropout rate over three times the national average. In short, it is well established that attacks on students on the basis of their sexual orientation are harmful not only to the students' health and welfare, but also to their educational performance and their ultimate potential for success in life.

*Harper v. Poway Unified School District*, 445 F.3d 1166, 1178–79 (9th Cir.2006) (internal citations and references omitted).

"Minds, of course, are hard to change." Howard Gardner, *Changing Minds: The Art and Science of Changing our Own and Other People's Minds* 1 (2004). "[A] key to changing a mind is to produce a shift in the individual's 'mental representations[.]'" *Id.* at 5. As it is difficult to change attitudes and stereotypes after they have developed, it is reasonable for public schools to attempt to teach understanding and respect for gays and lesbians to young students in order to minimize the risk of damaging abuse in school of those who may be perceived to be different.

### 2. *The Free Exercise Clause Claim*

██ Plaintiffs also assert that the defendants' alleged conduct violates their First Amendment rights to exercise their religion freely as well as their parental rights to raise their children. They contend that

this presents a "hybrid" claim that must be decided under the strict scrutiny standard, which requires that challenged conduct have more than a mere rational basis. However, in *Brown*, the First Circuit rejected the same claim. *See* 68 F.3d at 538–39. *Brown* is binding precedent on this issue too. Therefore, the rational basis standard applies to plaintiffs' Free Exercise Clause claim. *See Leebaert*, 332 F.3d at 143–44; *Swanson*, 135 F.3d at 700.

■ More specifically, government conduct that "is neutral and of general applicability need not be justified by a compelling state interest even if [it] has the incidental effect of burdening a particular practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). *See also Employment Division, Oregon Department of Human Resources v. Smith*, 494 U.S. 872, 881 & n. 1, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Brown*, 68 F.3d at 538–39. Plaintiffs do not allege that the conduct at issue is not neutral or not of general applicability. Rather, they argue that this case is covered by a hybrid exception to the general rule.

In *Smith*, the Supreme Court described such a hybrid exception, requiring heightened scrutiny for cases that involve " 'the Free Exercise Clause in conjunction with other constitutional protections.' " *Brown*, 68 F.3d at 539 (*quoting Smith*, 494 U.S. at 881 & n. 1, 110 S.Ct. 1595). In *Smith*, the Court stated that a hybrid claim requiring heightened scrutiny could exist in a case involving conduct that violated the Free Exercise Clause and a parental right. 494 U.S. at 881, 882, 110 S.Ct. 1595.[6]

The parent plaintiffs in *Brown* asserted that they had alleged such a hybrid claim. The First Circuit rejected this contention, writing:

The most relevant of the so-called hybrid cases is *Wisconsin v. Yoder*, 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972), in which the Court invalidated a compulsory school attendance law as applied to Amish parents who refused on religious grounds to send their children to school. In so holding, the Court explained that

*Pierce* stands as a charter of the rights of parents to direct the religious upbringing of their children. And, when combined with a free exercise claim of the nature revealed by

---

6. As the Second Circuit has noted "no circuit has yet actually applied strict scrutiny based on [the hybrid] theory." *Leebaert*, 332 F.3d at 142. In contrast to the First Circuit in *Brown*, the Second Circuit understands the discussion in *Smith* concerning hybrid claims to be only dicta and, therefore, not binding. *Id.* at 143. It has decided not to apply heightened scrutiny to hybrid claims, writing:

In *Kissinger v. Board of Trustees of the Ohio State University, College of Veterinary Medicine*, 5 F.3d 177 (6th Cir.1993), a case involving free exercise and various other First Amendment claims, the court explicitly rejected a more stringent legal standard for hybrid claims. *Id.* at 180. The court explained that it did "not see how a state regulation would violate the [F]ree Exercise Clause if it implicates other constitutional

rights but would not violate the Free Exercise Clause if it did not implicate other constitutional rights." *Id.* We too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated. "[T]herefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard" to evaluate hybrid claims. *Id.*
*Id.*

This discussion might cause the First Circuit to reconsider its suggestion in *Brown* that heightened scrutiny is required for hybrid claims. 68 F.3d at 539.

this record, more than merely a "reasonable relation to some purpose within the competency of the State" is required to sustain the validity of the State's requirement under the First Amendment.

*Id.* at 232–33, 92 S.Ct. at 1542 (discussing *Pierce,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070). We find that the plaintiffs allegations do not bring them within the sweep of *Yoder* for two distinct reasons.

First, as we explained, *the plaintiffs' allegations of interference with family relations and parental prerogatives do not state a privacy or substantive due process claim. Their free exercise challenge is thus not conjoined with an independently protected constitutional protection.* Second, their free exercise claim is qualitatively distinguishable from that alleged in *Yoder.* As the Court in *Yoder* emphasized:

> the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a Statute generally valid as to others.

*Id.* at 235, 92 S.Ct. at 1543. Here, the plaintiffs do not allege that the one-time compulsory attendance at the Program threatened their entire way of life. Accordingly, the plaintiffs' free exercise

claim for damages was properly dismissed.

68 F.3d at 539 (emphasis added).

This discussion and conclusion is equally applicable to the instant case. As explained earlier, as in *Brown,* "the plaintiffs' allegations do not state a privacy or substantive due process claim." *Id.* Rather, as the First Circuit also wrote in *Brown,* "the rights of parents as described by *Meyer* and *Pierce* do not encompass a broad-based right to restrict the flow of information in the public schools." *Id.* at 534.

Once again, *Brown* is not factually distinguishable from the instant case in any material respect. Nor has its authority on the hybrid claim issue "unmistakably been cast into disrepute by supervening authority." *Eulitt,* 386 F.3d at 349. Although the First Circuit has not had occasion to address the hybrid claim issue after *Brown,* the only comparable cases in other Circuits have reached the same result. *See Swanson,* 135 F.3d at 699–700 (relying in part on *Brown* in finding that a hybrid free exercise-parental rights claim was not alleged concerning a refusal to allow plaintiff's child to attend public school part-time); *Leebaert,* 332 F.3d at 143–44 (noting *Brown* in finding that heightened scrutiny was not required when a parent alleged that a school's refusal to excuse his son from a mandatory health education course violated his free exercise and parental rights). Therefore, the defendants' conduct does not violate plaintiffs' free exercise rights if there is a rational basis for it. As explained earlier, such a justification amply exists in this case.[7]

---

7. The second reason relied upon by the First Circuit to reject the plaintiff parents' hybrid right claim in *Brown* also applies here. As in *Brown,* "the plaintiffs do not allege that [the conduct at issue] threatened their entire way of life." *Brown,* 68 F.3d at 539. Therefore, this case is distinguishable from *Yoder.* Moreover, it appears that even if the complaint were amended to make such an allegation, the First Circuit would again find that plaintiff's "free exercise claim is qualitatively distinguishable from that alleged in *Yoder.*" *Id.*

### 3. *Conspiracy*

Plaintiffs have also failed to allege a conspiracy for which § 1983 provides a remedy. Such a conspiracy requires an agreement between two or more people, an overt act, and an actual deprivation of a right secured by the Constitution or laws of the United States. *See Earle v. Benoit,* 850 F.2d 836, 844 (1st Cir.1988).

As described earlier, the alleged conduct of the defendants in this case does not violate any right of the plaintiffs protected by the Constitution. No violation of any federal statutory duty is alleged. Therefore, any agreement among the defendants is not an unlawful conspiracy for which § 1983 would provide a remedy.

### C. *The State Law Claims Are Being Dismissed Without Prejudice*

■ Because all of plaintiffs' federal claims are being dismissed, the court must decide whether to exercise its discretion to retain jurisdiction over their state law claims. In this case is not appropriate to do so.

■ "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995). The Supreme Court has explained that:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well.

*United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

It is particularly appropriate that this guidance be followed in the instant case. Among other things, plaintiffs allege a violation of the statute that requires parents be given notice and an opportunity to exempt their children from any "curriculum which primarily involves human sexual education or human sexuality," M.G.L. c. 71, § 32A. The parties dispute whether there is a private right of action to enforce this statute. Moreover, defendants contend that the conduct at issue in this case does not "primarily involve[ ] human sexual education or human sexuality."

The courts of the Commonwealth of Massachusetts have not decided either of these issues. General considerations of comity, and the particular value of providing the Massachusetts courts an opportunity to decide authoritatively the meaning of the Massachusetts statute, persuade this court that plaintiffs' pendent state claims should now be dismissed without prejudice.

### IV. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Defendants' motion to dismiss (Docket No. 18) as to Count I, which includes all of plaintiffs' federal claims, is ALLOWED.

2. Plaintiffs' remaining state law claims are DISMISSED without prejudice to be-

ing reinstituted in the courts of the Commonwealth of Massachusetts.